UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAVETECH GLOBAL, INC., a Delaware Corporation, and BV ADVISORY PARTNERS, LLC, a New Jersey Limited Liability Company,<br><br>       *Plaintiffs,*<br><br>  v.<br><br>SPECTRUM GLOBAL SOLUTIONS, INC., a Nevada Corporation,<br><br>       *Defendant*. | Civil Action No. 19 Civ. 6485 (AKH)<br><br>**AMENDED COMPLAINT**<br><br>**(Demand for Jury Trial)** |

  Plaintiffs WaveTech Global, Inc., a Delaware corporation ("Global"), and BV Advisory Partners, LLC, a New Jersey limited liability company ("BV Partners," and together with Global, "Plaintiffs"), by and through their undersigned counsel, hereby bring this civil action against Defendant Spectrum Global Solutions, Inc., a Nevada corporation ("Spectrum" or "Defendant"), alleging on knowledge with respect to their own acts and on information and belief with respect to all other matters the following:

## NATURE OF THE CASE

  1. This is an action seeking damages after Spectrum unilaterally and improperly decided that it would not go forward with a May 17, 2019 closing on a planned merger under the terms of a Share Purchase Agreement (the "SPA" or the "Agreement") (attached as Ex. A). The merger, which would have resulted in a combined value of over $100 million, was scuttled after Spectrum received an unsolicited letter from a non-party to the SPA stating that there was an objection to the proposed merger.[1]  Instead of attempting to work through what was—plainly

---

[1] This tortious interference by the self-described non-party to the SPA, WaveTech GmbH, is the subject of a separate pending proceeding before the Superior Court of the State of Delaware,

speaking—an utterly baseless claim, Spectrum wrongfully refused to close. Thus, Plaintiffs consider the SPA terminated as of May 17, 2019. With Spectrum walking away from the deal, Global was left to clean up the pieces from the broken agreement.

2. Following Spectrum's improper decision to not close, Spectrum failed to return over $1.3 million in funds advanced ahead of the closing, despite Spectrum's obligations to return those funds if the merger failed to close. After a June 19, 2019 press release noted that OTC Markets Group had identified improper promotional activities related to Spectrum and Spectrum's stock dropped from $0.19 to $0.08 per share in 5 days, Plaintiffs demanded that the advanced funds be promptly returned or at least escrowed with Defendant's New York lawyers pending a resolution. Despite repeated requests for return of the funds or assurances that the funds were safe, Spectrum remained unresponsive.

3. After Plaintiffs advised that they would seek legal recourse, rather than returning or preserving the advanced funds, Spectrum sent Global a termination letter (the "Termination Letter") (attached as Ex. B) on July 9, 2019, stating that Spectrum "hereby terminates that certain Share Purchase Agreement … pursuant to Section 9.1(e) of such agreement." Section 9.1(e), which provides for termination by Spectrum on or before a date certain, was inapplicable given the fact that the Closing (as defined under the SPA) had been aborted because of Spectrum's delay and nonperformance. *See id.* (providing for termination "… if the closing has not occurred on or before February 28, 2019 for any reason other than delay or nonperformance of [Spectrum]…."). Spectrum's attempt to shoehorn the termination into Section 9.1 was not surprising since Section 9.2 of the SPA provided for, subject to certain exceptions, no liability for termination under Section

---

Complex Commercial Litigation Division, captioned *WaveTech Global, Inc.,* et al. *v. WaveTech GmbH,* et al., C.A. No. N19C-06-070 PRW CCLD (Del. Super. June 7, 2019).

9.1. In short, having improperly terminated the SPA, Spectrum sought to wash its hands of any liability.

4.      Remarkably, Spectrum further compounded its wrongful conduct with the issuance of a July 10, 2019 press release (the "Press Release") (attached as Ex. C) falsely stating that Spectrum "elected to terminate the Agreement [SPA] due to a failure of certain representations, warranties and conditions set forth in the Agreement." *See* Ex. C. Spectrum's CEO further chimed in, stating, "Attempting to be a disciplined acquirer and having already completed a number of successful acquisitions, with the failure of certain material representations and conditions we simply felt it was in the best interest of our shareholders to not move forward with the Agreement at the present time." The statements in the Press Release were not only false and misleading, they were also a further breach of the SPA. The defamatory statements led to an immediate influx of calls to Plaintiffs from incensed stockholders seeking to determine what improper had happened, causing harm to both Global's and BV Partners' reputations.

5.      Plaintiffs have been severely harmed by virtue of Defendant's misconduct.

## PARTIES

6.      Plaintiff Global is a global next generation software and data analytics company that specializes in monitoring, predicting, and protecting business operations, intellectual property development, and implementation services. Global is incorporated under the laws of the State of Delaware with its principal place of business in Hoboken, New Jersey. The majority stockholder of Global is BV Partners.

7.      Plaintiff BV Partners is a global strategic advisory and expert consulting firm, providing independent advice and regulatory and dispute consulting to clients that include global corporations, major law firms, financial institutions, family offices, and high net worth individuals.

BV Partners is a limited liability company organized under the laws of the State of New Jersey. There are three members of the BV Partners and they and reside in or are citizens of the following states, respectively: New Jersey, New York and California. As the majority owner of Global, BV Partners is a "Seller" as defined under the SPA

8. Defendant Spectrum holds itself out as a leading provider of comprehensive outsourced services and solutions for the deployment and maintenance of next generation and legacy wireless and wireline telecommunication networks and infrastructure. Spectrum is incorporated under the laws of the State of Nevada with its principal place of business in Longwood, Florida.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) because, as detailed above, Plaintiffs and Defendant are citizens of different States and the amount in controversy exceeds the sum or value of $75,000.

10. Venue is appropriate in this judicial district and this Court has personal jurisdiction over the parties because the parties agreed under Section 10.15 of the SPA that:

> ANY FEDERAL OR STATE COURT LOCATED IN NEW YORK COUNTY, STATE OF NEW YORK WILL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY. THE PARTIES HEREBY KNOWINGLY AND WILLING CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT LOCATED IN NEW YORK COUNTY, STATE OF NEW YORK, TO THE EXCLUSION OF ANY OTHER COURTS. TO THAT END, EACH OF THE PARTIES HERETO: (I) WAIVES, AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (B)

> SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (C) ANY LITIGATION COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM ….

## STATEMENT OF FACTS

**A. Global's Relationship with BV Partners and GmbH.**

11. Global was incorporated in the State of Delaware in December 2018 by BV Partners as a means to leverage BV Partners' substantial knowledge in end-to-end energy lifecycle management solutions and power analytics. With principals of BV Partners investing a substantial amount of time, money, and energy into developing a viable company, Global has made a number of successful acquisitions and has made substantial inroads in obtaining contracts for its services.

12. Prior to the formation of Global, BV Partners' was working with a German-based company known as WaveTech GmbH ("GmbH"). Specifically, BV Partners had been retained by GmbH to promote its technology known as Crystal Control Technology ("CCT"). According to GmbH, CCT could be used to control the growth of crystals for the manufacture of lead-acid batteries, with the purported effect of increasing durability of battery electrodes and generating a substantial saving of the electric current needed to charge batteries.

13. While BV Partners worked to help GmbH move towards an eventual IPO, significant concerns regarding both GmbH and CCT began to emerge in August 2018 when a key customer complained that GmbH had not delivered on its promises. As BV Partners investigated further, it became clear that GmbH's CCT had serious development problems, making the potential scalability and ultimate viability questionable.

14. In the meantime, Global—a separate company in which GmbH had no stake— began to become successful in its own right, making a number of significant acquisitions. While BV held out hope that GmbH would ultimately work through the issues, and would be part of

Global's success, until the CCT issues could be resolved, GmbH was in no position to participate with Global.

### B. Global and Its Shareholders Enter into the SPA.

15. In early 2019, Global together with its stockholders (primarily led by BV Partners) negotiated and entered into a January 23, 2019 letter of intent (the "January 23 LOI"), outlining a transaction by which Spectrum would acquire all the Global stock from Global's stockholders. Because Spectrum was a publicly traded U.S. company, it appeared to be an attractive merger partner which would allow Global to go public more rapidly. The January 23 LOI gave Spectrum an enterprise value of $20 million and Global an enterprise value of $110 million. As part of the deal, Global would be given the right to appoint 3 out of 5 directors on the Spectrum board.

16. On February 4, 2019, Global, Spectrum, and Global's stockholders (including BV Partners) entered into the SPA. While Global included a potential placeholder in the Spectrum/Global transaction for GmbH to potentially participate in a future merged entity, GmbH was not a party to the SPA—something that GmbH's principals were well aware of.

17. The merger would entail BV Partners (and the other Global stockholders) swapping their Global shares for Spectrum stock based on a price calculation under the SPA tied to the trading price of the Spectrum stock. Under the terms of the SPA, the stockholders of Global would become the majority stockholders of Spectrum which would later be renamed "WaveTech Global, Inc."

18. Under the SPA, Global provided Spectrum with $1,325,000 in advanced funds to be used by Spectrum to pay off obligations under a financing agreement with a third-party lender. The SPA provided that the cash would be treated as a deposit on cash payments due at closing. If the transaction did not close, the cash deposit would be treated as a loan with a term of 60 days.

19. At the time the Advanced Funds were paid to Spectrum, the parties contemplated a February 28, 2019 closing.

### C. Spectrum Delays the Merger.

20. Closing under the Agreement was originally scheduled for February 28, 2019. However, the day of closing, Spectrum decided to unilaterally delay closing the transaction. Based on Spectrum's principals' communications, it appeared that Spectrum was disappointed in its dipping stock price, which made the cost of going forward with the merger more expensive to Spectrum.

21. The failure to close in February 2019 was not due to any failure or act of non-performance by Plaintiffs.

22. Following the failure to close, Plaintiffs pushed to have a new closing date scheduled. Spectrum gave no inclination that they would not be closing.

23. Finally, after Global and BV Partners continued to press, in May 2019, Spectrum's President, Keith Hayter, advised that Spectrum would be willing to close on or before May 17, 2019. With the date for closing set, Global and BV Partners understood all conditions precedent to have been satisfied.

### D. GmbH Scuttles the Merger.

24. As the merger between Global and Spectrum moved closer, GmbH's principal Dag Valand began to demand his own personal and GmbH's participation in the Global/Spectrum merger. Despite the fact that Mr. Valand and GmbH had been aware that GmbH was not a party to the merger since the January 23 LOI, by March 2019, Valand began demanding that both he and GmbH be granted the lion's share of the combined enterprise. While Global and BV Partners were willing to have GmbH participate in a post-merger share swap, the deal was between Global

7

and Spectrum. Valand, however, appeared to believe that he could hold the deal hostage and extract a ransom from Global and BV Partners.[2]

25.     With the merger of Global and Spectrum set to close on May 17, 2019, on May 16, 2019, GmbH sent a letter to BV Partners. The letter referred to the January 23 LOI with Spectrum, as well as the SPA with Spectrum, and noted correctly that GmbH and another Delaware entity, WaveTech, Inc.,[3] were not parties to the LOI or the SPA. Although neither GmbH nor WaveTech, Inc. was a party to the SPA, the letter stated that "neither GmbH nor WaveTech, Inc. are agreeable to continuing the Spectrum transaction." GmbH "proposed that BV, GmbH, and Spectrum jointly meet to resolve ownership issues that create obstacles to the Spectrum transaction."

26.     The next day, May 17, at 9:59 a.m., the day of the intended closing, GmbH maliciously forwarded its letter, along with a second letter purporting to seize control of WaveTech, Inc., to the chairman and CEO and the president of Spectrum.

27.     Unknown at this time is whether Spectrum participated with GmbH in the strategy to claim control of Wavetech, Inc. Nevertheless, based on GmbH's false allegation that there were "ownership issues" affecting the merger, Spectrum refused to close.

---

[2] GmbH breached various contractual obligations to BV Partners, including the failure to negotiate in good faith the entry into a final agreement concerning the scope of their relationship. This breach is the subject of certain of the proceedings pending in the Delaware state courts. There also is a companion action that was filed by Plaintiffs against GMBH in the Southern District of New York.

[3] WaveTech, Inc. is another entity that is wholly owned by BV Partners. On May 16, 2019, GmbH purported to exercise an option to acquire all the shares of WaveTech, Inc. BV Partners denies that this exercise was effective. This matter is pending before the Court of Chancery of the State of Delaware in a litigation captioned *WaveTech GmbH,* et al. *v. Keith Barksdale,* et al., C.A. No. 2019-0432-AGB. Despite GmbH's effort to have a status quo order entered placing GmbH in control, the status quo order that was ultimately entered by the Chancellor on July 8, 2019, placed BV Partners' principal Keith Barksdale in charge as the President, CEO, and Sole Director of WaveTech, Inc. pending the outcome of the litigation.

**E. Spectrum Fails to Return the Deposit and Issues the Defamatory Press Release.**

28.  After the merger failed to close, Global sought the return of the $1,325,000 in advanced funds. Despite repeated calls being placed and emails being sent to Spectrum's counsel regarding return of the deposit, no funds were returned. When Plaintiffs learned that the stock price of Spectrum dropped significantly and saw a June 19, 2019 press release concerning alleged illegal stock promotion, Plaintiffs redoubled their efforts to have the funds returned, or at least deposited with Defendant's New York counsel.

29.  Despite repeated efforts to reach a resolution, Spectrum gave no assurances and did not return the advanced funds.

30.  Finally, on July 8, 2019, one of Plaintiffs' principals, Keith Barksdale, advised Spectrum's management that legal proceedings would be initiated barring any assurances. Instead of providing those assurances, the following day, on July 9, Spectrum's CEO Roger Ponder sent the Termination Letter, stating:

> Spectrum Global Solutions, Inc. (the "Company") hereby terminates that certain Share Purchase Agreement, by and among the Company, WaveTech Global, Inc., and the stockholders of WaveTech Global, Inc., dated as of February 4, 2019, pursuant to Section 9.1(e) of such agreement.

Nothing referenced the return of the advanced funds, and to date, no funds have been returned.

31.  The Termination Letter made clear that Spectrum was not going to take responsibility for having walked away from the merger. The provision of the Agreement referenced in the Termination Letter states in relevant part:

> 9.1   Termination. This Agreement may be terminated at any time prior to the Closing as follows: …
>
> (e)   By Buyer [Spectrum], upon written notice to Sellers [Global stockholders], if the Closing has not occurred on or before February 28, 2019 for any reason other than delay or nonperformance of Buyer and only in the event that Seller has either caused, or not

cured within twenty days, the reason for Buyer exercising its right to terminate this Agreement pursuant to this Section 9.1….

Section 9.2 of the Agreement states:

> <u>Effect on Obligations</u>. **In the event of the termination of this Agreement pursuant to Section 9.1, no Party will have any liability under this Agreement to any other Party**, except that: (a) nothing herein shall relieve any Party from any liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement; and (b) the provisions of Article X shall survive such termination.
>
> *Emphasis added.*

32. Section 9.1(e) is not applicable.

33. Spectrum had not sent written notice to Sellers. Moreover, the failure of the Closing to occur was caused, *first*, by the delay of Spectrum and, *second*, by the non-performance of Spectrum. Therefore, Spectrum cannot take refuge in Section 9.2 of the Agreement.

34. A determination as to whether the SPA can be terminated under Section 9.1(e) is critical to the rights of the parties as it impacts, *inter alia*, damages and control of the Advanced Funds.

35. On July 9, Spectrum also issued the Press Release. The Press Release falsely stated that Spectrum "elected to terminate the Agreement due to a failure of certain representations, warranties and conditions set forth in the Agreement." Ex. C. The Press Release also included a false statement by Spectrum's CEO Roger Ponder on behalf of Spectrum:

> Attempting to be a disciplined acquirer and having already completed a number of successful acquisitions, with the failure of certain material representations and conditions we simply felt it was in the best interest of our shareholders to not move forward with the Agreement at the present time.

*Id.* At no time had Spectrum notified Global or BV Partners of any "failure of certain representations, warranties and conditions" much less "the failure of certain material

representations and conditions." The statements were outright fabrications. However after the issuance of the Press Release, Plaintiffs immediately received an influx of calls and emails concerning the claims.

36. Defendant's release of the Press Release without prior approval of Global also constituted a breach of the SPA. Section 10.14 of the SPA (which would survive the termination of the SPA) states that "None of Buyer, the Company, or Sellers (or any of their respective Affiliates) shall make any public announcement or communication or issue any circular in connection with the existence or the subject matter of this Agreement without the prior written approval of all the other Parties (such approval not be unreasonably withheld, conditioned or delayed)." Defendant did not seek the approval for the Press Release from either Plaintiff.

## FIRST CAUSE OF ACTION
**(Breach of Contract)**

37. Plaintiffs adopt and re-allege each and every allegation contained in paragraphs 1 to 36 above as if fully alleged herein.

38. Plaintiffs and Defendant entered into the SPA, which was an enforceable contract under Delaware law.

39. The Agreement provided that Defendant would perform certain obligations to close a merger with Global. The Agreement was supported by consideration, and all conditions precedent to close on the transaction were fulfilled or waived by the parties.

40. Notwithstanding the foregoing, Spectrum and its counsel, Pryor Cashman, claim the SPA is null and void because of the failure of certain conditions precedent delineated in the SPA, which is maintained can only be waived in writing.

41. Said position is unavailing because Delaware law does not require a written waiver, even if the subject agreement provides for a written waiver. In fact, Delaware law allows that a

non-waiver clause in a contract may itself be waived through knowledge, coupled with silence and conduct inconsistent with the terms of the contract.

42. Spectrum itself, and/or through its counsel Pryor Cashman, waived any conditions precedent to closing.

43. Spectrum itself, and/or through its counsel Pryor Cashman, engaged in conduct inconsistent with requiring a written waiver of the non-waiver clause.

44. For example, Mr. Panjwani of Pryor Cashman recommended and counseled the parties not to merge certain entities into Global to avoid potential liabilities to the merged entity.

45. As such, Messrs. Ponder and Hayter of Spectrum were aware of and concurred that GmbH, Retron, and Southern Power were not going to be merged into Global. Spectrum determined to proceed with the merger nonetheless.

46. The conduct of Messrs. Panjwani, Ponder, and Hayter constitute waiver and/or satisfaction under Delaware law.

47. Therefore, Spectrum waived any conditions precedent to closing.

48. In any event, when Spectrum purported to terminate the SPA, wrongfully, it did not cite the failure of conditions precedent.

49. By reason of the foregoing, the SPA was an enforceable agreement and was breached by Spectrum.

50. Defendant further materially breached the Agreement by, among other things, repeatedly failing to close the merger as required by the Agreement. Specifically, the Agreement provided for the swap of stock between BV Partners and Global's other stockholders and Spectrum. No "Closing" as required by the Agreement was completed, and the merger remains incomplete.

51. Defendant has also failed to return or take measures to preserve the funds advanced to Defendant by Global.

52. Specifically, Global advanced $1,325,000 in funds to pay off a third-party lender. Under the terms of the Agreement, such funds were to be returned to Global.

53. The Advanced Funds have not been returned.

54. Despite bona fide concerns regarding Defendant's financial stability, Defendant has failed to provide any assurances that such amounts will be returned. Global has asked that Defendant sign UCCs to safeguard the advanced funds, but Defendant has failed to do so. Defendant's failure to provide such assurances in the face of other breaches of the Agreements constitutes anticipatory breach of contract.

55. In summary, Defendant materially breached the Agreement by, among other things, failing to close the merger, failing to return the Advanced Funds, issuing an unapproved Press Release which falsely stated that that certain material conditions and representations were not fulfilled by Plaintiffs. As to the latter, under the terms of the Agreement, any press release needed to be approved in advance of its release. *See* Ex. A at Section 10.14.

56. By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

57. Plaintiffs adopt and re-allege each and every allegation contained in paragraphs 1 to 56 above as if fully alleged herein.

58. Plaintiffs seek a declaratory judgment that Defendant was not permitted to terminate the SPA pursuant to Section 9.1(e) of the Agreement and that Defendant's liability for breach of the SPA is not otherwise limited.

59.     Determination of this issue between Plaintiffs and Defendant entails an actual controversy in that this case involves the rights or other legal relations of Plaintiff; the claim of right or other legal interest is asserted against Defendant who appears to have an interest in contesting the claim; the controversy is between parties whose interests are real and adverse; and the issues involved in the controversy are ripe for judicial determination.

60.     Specifically, an actual controversy exists between Plaintiffs and Defendant in that Defendant claims in its Termination Letter that it was terminating the Agreement under Section 9.1(e). However, such termination was improper because Spectrum had not sent written notice to "Sellers" (which included BV Partners) and the failure of the Closing to occur was caused, first, by the delay of Spectrum and, later, by the non-performance of Spectrum.

61.     A determination with the SPA in the terminated is critical to the rights of the parties in the New York and Delaware litigation and further impacts the scope of damages of Plaintiffs. Plaintiffs lack adequate remedies at law.

62.     Plaintiffs have suffered damages as a result of the breaches, with the amount of such breach to be determined at trial.

63.     As such, Plaintiffs seek a declaratory ruling that Defendant was not permitted to terminate the Agreement under Section 9.1(e) and that Defendant's liability for breach is not limited by Section 9.2. Plaintiffs are entitled to relief under the Federal Declaratory Judgment Act.

### THIRD CAUSE OF ACTION
**(Defamation)**

64.     Plaintiffs adopt and re-allege each and every allegation contained in paragraphs 1 to 63 above as if fully alleged herein.

65.     Defendant made and/or published slanderous statements regarding Plaintiffs, stating that Spectrum "elected to terminate the Agreement due to a failure of certain

representations, warranties and conditions set forth in the Agreement." The Press Release also included a false statement by Spectrum's CEO Roger Ponder on behalf of Spectrum, namely that "with the failure of certain material representations and conditions we simply felt it was in the best interest of our shareholders to not move forward with the Agreement at the present time."

66. The statements are defamatory in that such statements injured Plaintiffs' reputations and diminished the esteem, respect, goodwill, or confidence in which Plaintiffs were held, or in that these statements excited adverse, derogatory, or unpleasant feeling or opinions against them.

67. The statements made by Defendant were not true or substantially true and Defendant was not privileged in making the statements.

68. The statements made by Defendant were false statements that were published to third parties without privilege or authorization. Such statements were intentionally made by Defendant. Plaintiffs have been harmed.

69. The statements made by the Defendant constitute defamation per se since it tends to injure Plaintiffs in their trade, business, and/or profession.

70. Plaintiffs have suffered damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

A. With respect to the First Causes of Action:

(1) Compensatory damages according to proof;

(2) Pre-judgment interest to the extent allowed by law;

(3) Post-judgment interest to the extent allowed by law; and

(4) Such other and further relief as this Court deems just and appropriate.

B.   With respect to the Second Cause of Action:

   (1)   Declaratory and Injunctive Relief as Requested;

   (2)   Preliminary injunctive relief to preserve the advanced funds; and

   (3)   Such other and further relief as this Court deems just and appropriate.

C.   With respect to the Third Cause of Action:

   (1)   Compensatory damages according to proof;

   (2)   Pre-judgment interest to the extent allowed by law;

   (3)   Post-judgment interest to the extent allowed by law;

   (4)   Exemplary and punitive damages; and

   (5)   Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by a jury of 12 persons on all issues so triable.

Dated: October 17, 2019

HALLORAN FARKAS + KITTILA LLP

*/s/ T. A. Kittila*
_____
Theodore A. Kittila (TK-6715)
5803 Kennett Pike, Suite C
Wilmington, Delaware 19807
Tel: (302) 257-2011
Fax: (302) 257-2019
Email: tk@hfk.law

*Attorneys for Plaintiffs*